AUSA: KAREN STEWART

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) |
| v. | ) Case No. 15ms 7095 JCB |
| Will D. Allen and Susan C. Daub | ) |
|  | ) 15-6264-BSS |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 2012 through the present__ in the county of __Essex and elsewhere__ in the _____ District of __Massachusetts__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 15 USC §§ 78j(b) and 78(ff) | Securities fraud |

This criminal complaint is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

_____
Complainant's signature

Sheila R. Magoon, FBI Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 06/10/2015

_____
Judge's signature

City and state: Boston, Massachusetts

Hon. Jennifer C. Boal, U.S. Magistrate Judge
Printed name and title

## Affidavit of Sheila R. Magoon

I, Sheila R. Magoon, hereby declare as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been employed as such since September 2003. I have been assigned to the Economic Crimes Squad in the Boston Field Office since 2004. I am also a certified public accountant.

2. I make this affidavit in support of a criminal complaint charging WILL D. ALLEN and SUSAN C. DAUB with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78(ff).

3. The facts in this affidavit come from my personal involvement in this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including the Securities and Exchange Commission. In submitting this affidavit, I have not included every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

### Background

4. Capital Financial Partners, LLC ("CFP") is a limited liability company registered in Massachusetts on June 7, 2012. According to its registration documents, CFP's address is 470 Atlantic Ave., 7th Floor, Boston, MA 02210. Its registered agents are ALLEN and DAUB.

5. As recently as March 2015, CFP's webpage, www.capfinp.com, advertised "private lending to unique individuals" and featured photos of high-end real estate and luxury goods (including what appeared to be an Aston Martin Vanquish and a Gulfstream G650 private jet). The webpage indicated that the firm "specializes in issuing short-term loans to professional athletes." The page explained that: "[i]n many cases, athletes' contracts do not allow them to access their guaranteed money during the off season or early in the season when they may need a significant sum to purchase a house or car, pay bills or meet a financial demand. By pooling the

resources of a network of investors, CFP gives athletes access to money when they need it while providing investors with solid, short-term returns on investment." CFP's webpage is no longer publicly available.

6. According to the CFP website, CFP's average loan to an athlete was for $600,000 "on a 12 month term at very favorable rates for the industry." The page indicated that CFP's minimum loan was $75,000. There was no stated maximum. The webpage noted that loans "are only limited by there [sic] purpose and your ability to repay."

7. Although the CFP webpage purported to link to online loan request forms for athletes, entertainers, and real estate developers, each of the page's links directed visitors to the same page, which contained a loan request form for athletes. That form called for the player's name and e-mail address, and asked the following questions:

- Is the player under an existing contract?
- What sport does the borrower play?
- How much is next season's salary?
- How much is the player looking to borrow?

8. At the bottom, the webpage listed an address for "CFP Southeast" in Coral Springs, Florida and an address for "CFP Northeast" in Boston. Both locations listed the same contact phone number, which had a Boston-area exchange (617).

### WILL D. ALLEN and SUSAN C. DAUB

9. WILL D. ALLEN is a former professional football player who played in the National Football League from 2001 through 2011. In 2012, he signed a one-year contract with the New England Patriots, but was put on the injured reserve list in August of that year, and did not play during the season. As recently as February 6, 2015, in a bankruptcy court filing I believe to have been signed by ALLEN, ALLEN identified himself as Managing Partner of CFP. ALLEN lives in Davie, Florida.

2

10. SUSAN C. DAUB is a former employee of Regions Bank who lives in Coral Springs, Florida. According to the public portions of DAUB's LinkedIn profile, DAUB works for CFP in the Miami/Fort Lauderdale area. DAUB's profile describes CFP as offering financial services and says that it "specializes in lending to Professional Athletes." According to the profile, DAUB has been the managing partner of CFP since June 2012. The profile indicates that she performs work for CFP in both Florida and Massachusetts.

11. DAUB's LinkedIn profile indicates that, before joining CFP, she was the president of SCD Global Group from February 2010 to June 2012, where, she "[s]pecialize[d] in high net worth Domestic and International Life Insurance." The profile indicates that, before SCD Global, DAUB was a Vice President and Private Banker at Regions Bank from 2007 to 2010. DAUB's profile lists banking, loans, and private lending among her skills.

12. Before being registered as an LLC in Massachusetts, CFP was registered in Florida. ALLEN and DAUB were its registered agents. The Florida entity was dissolved on August 20, 2012.

13. ALLEN and DAUB are also the registered agents for several CFP-related companies registered in Florida and Massachusetts. Those companies include Capital Financial Partners Enterprises, LLC (registered Dec. 10, 2013 in Florida), Capital Financial Partners Holdings, LLC (registered December 17, 2013 in Florida), and Capital Financial Holdings, LLC (registered April 2, 2014 in Massachusetts).

14. ALLEN and DAUB were or are both signatories to all of the CFP bank accounts of which I am aware, including a CFP account at Bank of America (xxxx xxxx 8156) (the "8156 account"). CFP used the 8156 account to conduct most of the company's business.

## The Fraud Scheme

15. ALLEN and DAUB, raised money from investors by telling them that their money would be loaned to athletes at a high interest rate, in most instances after being pooled with the money of other investors. Although that sometimes occurred, ALLEN and DAUB also used investor money for their personal benefit and to pay other investors, falsely telling the recipients of the funds that the money represented returns on their investments. As part of the scheme, ALLEN and DAUB sometimes oversubscribed loans, falsely telling investors that loans were larger than they actually were and collecting more money from investors than was actually being loaned to an athlete. In other instances, ALLEN and DAUB collected money for loans that CFP never made. In total, ALLEN and DAUB collected from investors millions of dollars more than they loaned to athletes, and then spent much of that money on themselves and other business ventures.

## ALLEN and DAUB's Collection of Money for Non-Existent Loans

16. On multiple occasions, ALLEN and DAUB solicited and collected money from investors for loans that CFP never issued. Some of those transactions are described below.

### *Athlete 1*

17. Two of the fraudulent loans were ostensibly issued to Athlete 1, a professional baseball player. The first of these was funded in August 2014 by Investor 1, who contributed $300,000, the full value of the supposed loan. Investor 1, a Massachusetts resident, gave the money to CFP in reliance on representations made to him by DAUB that his money would be used to fund a loan to Athlete 1, who would repay it with interest. In the months after giving CFP the money, Investor 1 asked DAUB for copies of the loan agreement and other documentation signed by Athlete 1. On October 1, 2014, DAUB sent Investor 1 an e-mail to which she attached what she called "the signed note from [Athlete 1]." The attachment contained what appeared to

4

be a loan agreement and promissory note between Athlete 1 and CFP for a $300,000 loan to Athlete 1. Both documents appeared to have been signed by Athlete 1, whose signature was notarized. One of the documents also appears to have been signed by DAUB.

18. The signatures of Athlete 1 on the loan agreement and the promissory note were forged. Athlete 1 did not sign the documents or receive a loan from CFP. Instead of being used to fund a loan to Athlete 1, the money invested by Investor 1 was used, in part, to fund a separate loan to a different professional baseball player, which loan was supposed to have been funded by other investors. The remainder of Investor 1's money was used, among other things, to make payments to existing investors, to make transfers of approximately $60,000 to Insurance Depot of America (a Florida company registered to ALLEN), and to make transfers directly to ALLEN, who received a combined $46,000 between August 29 and September 3, 2014. In the days following the transfer of the money to his personal account, ALLEN made thousands of dollars in payments for apparently personal expenditures, including payments to American Express and to Nordstrom.

19. To keep Investor 1 from discovering their fraud, ALLEN and DAUB made payments to him roughly in accordance with the schedule set forth in the Participation Agreement between Investor 1 and CFP, creating the false impression that Athlete 1 was repaying the purported loan on schedule. The money used to make the repayments, in fact, came, at least in part, from money provided to CFP by new investors.

20. In November 2014, DAUB solicited $300,000 from Investor 2, another Massachusetts resident, for a second purported loan to Athlete 1. As with Investor 1, Investor 2 gave the money to CFP in reliance on representations made to her by DAUB that her money would be used to fund a loan to Athlete 1, who would repay it with interest. On November 10, 2014, Investor 2 wired $300,000 to CFP's 8156 account.

5

21. CFP did not make a loan to Athlete 1. Instead, CFP used part of Investor 2's money to make a loan to a professional basketball player, which loan was supposed to be have been funded by other investors. The remainder of Investor 2's money was used, among other things, to fund a $7,000 check to DAUB's son and to make a payment of $5,426 to the Internal Revenue Service.

### Athlete 2

22. In November 2014, ALLEN and DAUB collected $100,000 for a loan that was ostensibly to be issued to Athlete 2, a professional baseball player. On or about November 14, 2014, Investor 3, a Massachusetts resident, wired $100,000 to the 8156 account to fund the purported loan in reliance on representations made to him by DAUB that his money would be used to fund a loan to Athlete 2, who would repay it with interest.

23. ALLEN and DAUB did not make a $100,000 loan to Athlete 2. Instead, they used Investor 3's money for other purposes.

24. To keep Investor 3 from discovering their fraud, ALLEN and DAUB made payments to him in accordance with the schedule set forth in the Participation Agreement between Investor 3 and CFP, creating the false impression that Athlete 2 was repaying his purported loan on schedule. On February 25, 2015, for instance, ALLEN sent Investor 3 an e-mail, copying DAUB, in which he said, "[Investor 3], An ACH payment of $47,384.12 was sent out today: This payment is for the following loans: . . . [Athlete 2]: $750." CFP's bank records show that, on February 24, 2015, CFP wired that amount out of the 8156 account.

### ALLEN and DAUB's Collection of Money for Oversubscribed Loans

25. In addition to collecting money for loans that were never issued, ALLEN and DAUB also collected more money than was necessary to make some of the loans that CFP did issue. To disguise their over-collection, ALLEN and DAUB sent CFP investors documents

6

showing loan values that were higher than the values on the documents signed by the borrower athletes. Some of those transactions are described below.

### Athlete 3

26. Between April and May of 2014, ALLEN and DAUB collected approximately $3.5 million for an April 2014 loan to a professional hockey player, Athlete 3, to whom CFP had made several loans in the past. ALLEN and DAUB provided at least some of those investors with what purported to be signed loan agreements between Athlete 3 and Capital Financial Holdings, signed promissory notes, and signed direct deposit agreements, all of which showed a face value for the loan of $5.65 million. In fact, the face value of the April 2014 loan was only $3.4 million, and only $500,000 of that was new money for Athlete 3. (The remainder represented a refinancing of Athlete 3's existing loans with CFP.)

27. Accordingly, ALLEN and DAUB collected approximately $3 million more than they loaned to Athlete 3 in April 2014. The excess money collected in his name was spent, among other ways, making over $2 million in payments to past investors; funding loans to other athletes; and making transfers of approximately $350,000 to ALLEN and approximately $165,000 to Encore Capital Properties, LLC, a Florida company registered to ALLEN, DAUB, and DAUB's son. On May 6, 2015—the same day on which $300,000 was transferred from CFP's 8156 account to ALLEN's personal bank account—ALLEN wired $300,000 to a company called Advocates for America, LLC with the memo "My Advocate Investment."

28. ALLEN and DAUB lulled investors in the oversubscribed loan to Athlete 3 by concealing from them his non-payment on the money he had, in fact, borrowed, which they accomplished, in part, by making timely payments to investors using money provided by new investors. On December 5, 2014, for instance, CFP wired approximately $16,698.42 to four investors in Athlete 3's loan, despite the fact that Athlete 3 had not made any payments himself.

7

As described further in Paragraph 38, below, those payments would not have been possible without an investment of $100,000 by another CFP investor earlier that day.

29. ALLEN and DAUB also lulled investors by falsely telling them that Athlete 3 was making payments, and that his loan was performing as expected. On November 21, 2014, DAUB sent an e-mail to investors with the subject, "[Athlete 3] loan." The e-mail was signed "Will and Sue." In it, ALLEN and DAUB falsely told investors, "Our loan with [Athlete 3] is performing as expected. All payments have been made in full and on time." In fact, as both ALLEN and DAUB knew, Athlete 3 had not made all payments on time and in full, and instead had declared bankruptcy in early October 2014. In their e-mail, ALLEN and DAUB also falsely told investors that ALLEN and DAUB had "been in contact with [Athlete 3's] financial advisors and attorney. They have assured us that we have nothing to worry about. We are not considered one of his bad creditors and we will receive all payments timely and will most likely be paid off early." ALLEN and DAUB further stated, "We want to assure you that your investment is safe and that you will be receiving your payments on time."

30. On February 9, 2015, in a filing that appears to have been signed by ALLEN, Capital Financial Holdings, LLC submitted a claim for $3,429,750 as a creditor in Athlete 3's bankruptcy action. In the attachment to Capital Financial Holdings's proof of claim, it represented that, in April of 2014, it had made a loan of $3.4 million—not $5.65 million—to Athlete 3. Also included in the attachments to the proof of claim was a copy of a loan agreement for $3.4 million between Athlete 3 and Capital Financial Holdings. The agreement appears to have been signed by Athlete 3 and, on behalf of Capital Financial Holdings, by ALLEN, whose title is given as "Managing Partner." In copies of nearly identical loan agreements given to investors that bore the loan amount $5.65 million, the agreement appears to have been signed by

8

Athlete 3 and by ALLEN, whose title is given as "Managing Member" of Capital Financial Holdings.

### Athlete 4

31. In or about March of 2015, DAUB contacted several CFP investors about a purported $2.5 million loan to Athlete 4, an NFL football player. In reliance on DAUB's representations, the investors gave CFP approximately $2.5 million to fund the loan.

32. CFP's actual loan to Athlete 4 was for only $500,000. Athlete 4 never entered into a loan agreement with CFP for $2.5 million, or for any amount greater than $500,000.

33. The money raised to fund the supposed loan to Athlete 4 was, in fact, used primarily for other purposes, including to make approximately $736,000 worth of payments to investors on existing loans. CFP also transferred $10,000 of investor money raised for the Athlete 4 loan to Insurance Depot of America, and transferred $170,000 of it to ALLEN's personal bank account.

### Use of Investor Money to Pay Other Investors

34. As noted, CFP frequently made payments to existing investors using money from new investments. Among the occasions on which it did this were the following:

### September 2014

35. On September 23, 2014, the balance in the 8156 account was approximately $7,429.39. On that day, the account received two $100,000 deposits, one from Investor 4 and one from Investor 5.

36. On the same day that CFP received the combined $200,000 of investments, it made approximately $154,192.56 in payments out of the 8156 account. Of that, approximately $84,885.42 was paid to CFP investors (including a $12,031.25 payment back to Investor 5) and characterized in memos on the wires as "Investor Payment[s]." Given the balance of $7,429.39 at

9

the beginning of the day, these investor payments could not have been made without the influx of new investments.

*October 2014*

37. CFP followed the same pattern in October 2014. On October 27, 2014, the 8156 account contained approximately $6,714.63. The next day, October 28, the account received three investments totaling $450,000. The same day, CFP wired $140,000 to another investor with the memo "Investor Payment."

*December 2014*

38. On December 4, 2014, the balance in the 8156 account was approximately $22,086.32. The next day, on December 5, CFP received another investment of $100,000 from Investor 5. The memo on the wire transfer said, "Attn: Susan Daub." Over the course of December 5, CFP paid out approximately $120,171.86 to twelve investors, payments it could not have afforded without the new investment by Investor 5.

39. On December 17, 2014, the balance in the 8156 account was approximately $15.22. The next day, it received another $100,000 investment from Investor 5. On the same day as the new investment, CFP paid over $3,000 to a different investor, describing the payment as an athlete loan payment. That payment would not have been possible without the December 18 investment by Investor 5.

*January 2015*

40. On January 5, 2015, the balance in the 8156 account was approximately $3,054.40. The next day, it received a $100,000 investment from Investor 6. Over that day and the next, January 7, 2015, CFP paid approximately $62,873.40 to investors using five wire transfers. The memos associated with some of those transfers made reference to "Loan

Repayment." The investor payments would not have been possible without the January 6, 2015 investment by Investor 6.

## March 2015

41. At the beginning of March 2015, the balance in CFP's escrow account was approximately $141,528.84. During that month, the account received just under $39,000 in loan repayments from athletes, but it made approximately $1,592,395 in payments to investors. Those payments were funded overwhelmingly by the approximately $4.2 million raised from investors during the same month, of which $2.5 million was raised to fund the supposed loan to Athlete 4.

## Use of Investor Money for Personal Expenses

42. In addition to using new investor money to pay back old investors, ALLEN and DAUB sometimes used investor money to pay themselves and their personal expenses. Between June of 2012 and March of 2014, the 8156 account shows the following payments, among others:

   a. Approximately $4.1 million (net) to ALLEN;

   b. Approximately $239,000 (net) to DAUB, plus additional amounts classified as payroll;

   c. Approximately $51,289 to DAUB's son;

   d. $20,000 to Aria Resort & Casino in Las Vegas, where ALLEN has an account;

   e. Approximately $41,080 to Seminole Hard Rock Casino in Hollywood, Florida, where ALLEN has an account;

   f. Approximately $16,500 to Nordstrom;

   g. Over $3,800 in iTunes purchases;

   h. Over $2,000 to Publix, a supermarket chain;

11

    i. Approximately $116,964 in debits less than $1,000 each to companies including, but not limited to, sandwich shops, fast food restaurants, a cigar store, a car wash, a laundromat, LA Fitness (a commercial gym), Starbucks Coffee, Primo Liquors, iTunes, Petsmart, Waffle House, Macy's, Dunkin Donuts, the YMCA, Publix, Neiman Marcus, and Barnes & Noble.

## Conclusion

43. Based on my knowledge, training, and experience and the facts set forth in this affidavit, I have probable cause to believe, and I do believe, that, in or about and between June 2012 and the present, WILL D. ALLEN and SUSAN C. DAUB committed securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Sworn to under the pains and penalties of perjury.

Sheila R. Magoon, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me June 10, 2015.

The Honorable Jennifer C. Boal
United States Magistrate Judge

12

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 15MJ7095 JCB |
| Will D. Allen and Susan C. Daub | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:   Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Will D. Allen                                              ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☑ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

Securities fraud, in violation of 15 USC §§ 78j(b) and 78(ff)

Date:   06/10/2015

*Issuing officer's signature*

Steve York Deputy Clerk
~~Hon. Jennifer C. Boal, U.S. Magistrate Judge~~

City and state:   Boston, Massachusetts

*Printed name and title*

### Return

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*